UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF ARKANSAS

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

**OCT 2 9 2013**

CHRIS R. JOHNSON, Clerk
By
_____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF ARKANSAS | ) ) ) |
| Plaintiffs, | ) ) |
| .v. | ) Civil Action No.  5:13-cv-05127-JLH ) |
| ARKANSAS EGG COMPANY, INC. | ) ) |
| Defendant. | ) ) |

## CONSENT DECREE

TABLE OF CONTENTS

I.       JURISDICTION AND VENUE ................................................................. 5

II.      APPLICABILTY ...................................................................................... 6

III.     DEFINITIONS ......................................................................................... 7

IV.      COMPLIANCE REQUIREMENTS ........................................................ 12

    A.    WELL INSTALLATION AND GROUNDWATER MONITORING ........................ 13

    B.    LAGOON CLOSURE ............................................................................... 17

    C.    NUTRIENT MANAGEMENT PLAN AND LAND APPLICATION ........................ 20

    D.    MORTALITY MANAGEMENT .................................................................. 23

    E.    PERMITS .............................................................................................. 23

    F.    SEPTIC SYSTEM AND LEACHFIELD ........................................................ 23

V.       CIVIL PENALTY .................................................................................. 24

VI.      REPORTING REQUIREMENTS ........................................................... 26

VII.     STIPULATED PENALTIES .................................................................. 32

VIII.    FORCE MAJUERE ............................................................................... 39

IX.      DISPUTE RESOLUTION ...................................................................... 42

X.       INFORMATION COLLECTION AND RETENTION ............................. 45

XI.      EFFECT OF SETTLEMENT / RESERVATION OF RIGHTS ............... 47

XII.     COSTS ................................................................................................... 49

XIII.    NOTICES ............................................................................................... 50

XIV.     EFFECTIVE DATE ............................................................................... 52

XV.      RETENTION OF JURISDICTION ........................................................ 52

XVI.     MODIFICATION ................................................................................... 52

XVII.    TERMINATION .................................................................................... 53

ii

XVIII. PUBLIC PARTICIPATION ................................................................................. 54

XIX.   SIGNATORIES / SERVICE ............................................................................. 54

XX.    INTEGRATION ............................................................................................. 54

XXI.   APPENDICES ................................................................................................ 55

XXII.  FINAL JUDGMENT ...................................................................................... 55

Concurrently with the lodging of this Consent Decree, co-Plaintiffs the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Arkansas, on behalf of the Arkansas Department of Environmental Quality ("ADEQ") (collectively, "Plaintiffs"), have jointly filed a complaint in this action alleging that Defendant Arkansas Egg Company, Inc. ("Arkansas Egg" or "Defendant") violated and continues to violate Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311 and Arkansas Waste and Air Pollution Control Act ("State Act"), Ark. Code Ann. §§ 8-4-217(a)(1) and (a)(2) by discharging pollutants into waters of the United States and the State.

WHEREAS, Arkansas Egg is an egg production company, among other secondary commercial activities, that owns and operates a poultry layer production facility in Summers, Arkansas (the "Summers Facility"), located in Washington County, which it purchased in May 2002;

WHEREAS, from August 2003 and until April 2009, Arkansas Egg also owned and operated a poultry layer production facility southeast of Lincoln, Arkansas (the "Appleton Facility"), located in Washington County, which consisted of four caged layer houses confining a total of 240,000 birds and an egg processing building, and which utilized a liquid Manure waste management system;

WHEREAS, from 2002 and until April 2009, Arkansas Egg also operated a rented facility southeast of Siloam Springs, Arkansas (the "Blair Facility"), located in Benton County, which consisted of three cage layer houses confining a total of 180,000 birds and an egg processing building, and which utilized a liquid Manure waste management system;

WHEREAS, after ceasing operations at the Appleton Facility and into the calendar year 2010, Arkansas Egg decommissioned and removed all of the buildings, and cleaned and

1

backfilled with soil all of the associated concrete Manure pits, taking the facility permanently out of operation.

WHEREAS, after ceasing operations at the Blair Facility and into the calendar year 2010, Arkansas Egg decommissioned and removed all of the buildings, and cleaned the associated concrete Manure pits, taking the facility out of operation.

WHEREAS, Arkansas Egg represents that, as of the date of signing this Consent Decree, it will continue poultry layer operations at its Summers Facility, but it will not resume poultry layer production operations at the Appleton Facility or the Blair Facility.

WHEREAS, from May 2002 until May 2008, the Summers Facility consisted of five cage layer houses, confining a total of 300,000 birds, utilized a liquid Manure waste management system with two on-site lagoons (the "Lagoons") receiving the Manure, and operated an egg processing plant, with the Lagoons receiving the Egg Washwater (these historic Summers Facility operations are hereinafter distinguished by reference to the "Original Summers Facility");

WHEREAS, between May 2008 and the Fall of 2008, Arkansas Egg converted its Original Summers Facility to a cage-free organic operation, such that the original five houses presently house approximately 82,500 laying hens without cages, and during this time Arkansas Egg also converted the Original Summers Facility's liquid Manure waste management system to a dry litter system, such that the Lagoons ceased receiving flushed liquid Manure from the barns;

WHEREAS, during the Fall of 2008, Arkansas Egg completed the closing of the liquid Manure waste management system at the Original Summers Facility by flushing and capping of all piping and associated conveyances within the barns and between the barns and the Lagoons.

2

WHEREAS, the present Summers Facility additionally has free-range organic operations conducted in ten adjacent buildings and two hoop houses (an area referred to by Arkansas Egg as "Holcraft") and consisting of approximately 24,000 laying hens, whose eggs are hand gathered and transported to the Summers Facility egg processing building to be washed, sorted, and packaged;

WHEREAS, after the May 2008 conversion of the Original Summers Facility, the existing Lagoons continued to receive and collect Egg Washwater from the on-site Summers Facility egg processing plant until approximately April 2011, at which time Arkansas Egg began utilizing a truck known as a "honey wagon" to immediately store and subsequently land apply Egg Washwater;

WHEREAS, during November 2012, Arkansas Egg discontinued using a honey wagon at its Summers Facility for the immediate storage and subsequent disposal of Egg Washwater and instead began utilizing a septic and leachfield system to collect, treat, and dispose of Egg Washwater at the Summers Facility, pursuant to an ADEQ permit, Permit No. 5164-W;

WHEREAS, ADEQ and Defendant entered into a Consent Administrative Order, identified as LIS 08-120, on September 29, 2008, to resolve violations at all three facilities operated by Defendant based on Ark. Code Ann. § 8-4-217(a)(3) and Arkansas Pollution Control and Ecology Commission ("APC&EC") Reg. Nos. 5.303, 5.406(A), 5.407(A), 5.407(C) and 5.407(E), which occurred prior to the alleged violations included in Plaintiffs' Complaint, filed concurrently with the lodging of this Consent Decree;

WHEREAS, EPA issued the following two administrative orders to Defendant pertaining to alleged violations of the CWA at the Original Summers Facility and Summers Facility:

3

Administrative Order No. CWA-06-2009-1758 (dated January 7, 2009) and Administrative

Order No. CWA-06-2011-1911 (dated December 13, 2011);

WHEREAS, EPA additionally issued Administrative Order No. CWA-06-2012-1817 to

Defendant on March 22, 2012, ordering Defendant to cease and desist all unauthorized

discharges of pollutants from the Summers Facility to waters of the United States;

WHEREAS, ADEQ also sent Defendant an Inspection Report and Enforcement

Notification on May 24, 2012, as amended on June 6, 2012, pertaining to violations of the CWA

and State Act;

WHEREAS, EPA and ADEQ herein acknowledge that, as of the date of lodging this

Decree, Arkansas Egg has substantially completed many of the affirmative requirements of the

above-referenced previously issued Administrative Orders and Inspection Report and

Enforcement Notification by: (a) ceasing use of the Lagoons for receiving liquid Manure,

subsequently ceasing use of the Lagoons for receiving process Egg Washwater, and submitting a

Closure Plan for the Lagoons, and (b) discontinuing the use of a honey wagon at the Summers

Facility as the primary disposal method for Egg Washwater;

WHEREAS, on May 10, 2011, Defendant applied for an Environmental Quality

Incentives Program ("EQIP") grant to receive financial assistance from the U.S. Department of

Agriculture, Natural Resources and Conservation Service ("NRCS"), Ft. Smith, Arkansas, office,

to carry out and complete the closure of the Lagoons, and on June 21, 2012, NRCS notified

Arkansas Egg that their EQIP funding was approved for an award amount of $192,255.00 to

close the Lagoons and that closure activities had to be completed by December 31, 2013;

WHEREAS, Defendant does not admit any liability to the United States or the State

arising out of the transactions or occurrences alleged in the Complaint;

4

WHEREAS, Defendant claims an inability to pay a civil penalty in this matter and has submitted financial information to the United States to support its claim, and the United States and the State have determined based on Defendant's information and representations that Defendant has limited ability to pay, resulting in the penalty required under this Consent Decree;

WHEREAS, the Parties recognize, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 1309(b) of the CWA, 33 U.S.C. § 1319(b), and over the Parties. This Court has supplemental jurisdiction over the State law claims asserted by the State of Arkansas, pursuant to 28 U.S.C. § 1367. Venue lies in this District pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Defendant conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 301 and 309 of the CWA, 33 U.S.C. §§ 1311 and 1319.

5

## II.   **APPLICABILTY**

3.      The obligations of this Consent Decree apply to and are binding upon the United States and the State of Arkansas, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Summers Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Consent Decree are implemented, unless (1) the United States, after consultation with the State, consents to relieve Defendant of its obligations, and (2) the transferee agrees to takeover and undertake the obligations required by Section IV (Compliance Requirements) of this Decree and to be added as a Party under this Decree and thus bound by the terms thereof. In the event that the positions of the United States and the State of Arkansas differ on whether to consent to relieve Defendant of its obligations under this Consent Decree, the position of the United States shall control. The United States' decision to refuse to approve the substitution of the transferee for Defendant to takeover and undertake the obligations required by Section IV shall not be subject to judicial review. At least thirty (30) days prior to any such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region VI, the United States Attorney for the Western District of Arkansas, the United States Department of Justice, the Arkansas Attorney General, and the Arkansas Department of Environmental Quality, in accordance with Section XIII of this Decree (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.      DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA or in regulations promulgated pursuant to the CWA, or the State Act and regulations promulgated pursuant thereto, shall have the meanings assigned to them in the CWA or such regulations, or in such State Act or regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "ADEQ" shall mean the Arkansas Department of Environmental Quality and any of its successor departments or agencies;

b.      "Agronomic Rates" shall mean the land application of Manure, Sludge, Litter, Waste, or Wastewater at rates consistent with the requirements of a Nutrient Management Plan approved by the Arkansas Natural Resources Commission and in accordance with Arkansas State law, including but not limited to Title 22 of the Arkansas Natural Resources Commission;

c.      "Clean Water Act" or "CWA" shall mean the federal Clean Water Act, 33 U.S.C. §§ 1251 – 1387;

7

d.      "Closure Plan" shall mean the document submitted by Defendant as
Appendix A, titled "Comprehensive Nutrient Management and Closure Plan Revision 2 for
Arkansas Egg Farm," dated April 25, 2013, and finalized June 10, 2013, which was prepared by
NRCS, in consultation with Defendant, and reviewed by the United States and the State of
Arkansas, and which provides requirements for closing the Lagoons to ensure that surface water
and groundwater are protected from discharges of Manure and other associated contaminants;

e.      "Complaint" shall mean the complaint filed by the United States and the
State of Arkansas in this action;

f.      "Consent Decree" or "Decree" shall mean this consent decree and all
appendices attached hereto (listed in Section XXI ("Appendices"));

g.      "Day" shall mean a calendar day unless expressly stated to be a business
day.  In computing any period of time under this Consent Decree, where the last day would fall
on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the
next business day;

h.      "Date of Lodging" shall mean the date this Consent Decree is lodged with
the Court by the United States;

i.      "Defendant" shall mean Arkansas Egg Company, Inc.;

j.      "Egg Washwater" shall mean, for purposes of this Consent Decree only,
wastewater directly or indirectly used in the operation of the Summers Facility for egg washing
and egg processing activities, which includes manure, blood, feathers, eggshells, and/or other
biological materials discarded from the egg production operations.

k.      "EPA" shall mean the United States Environmental Protection Agency
and any of its successor departments or agencies;

8

l.    "Effective Date" shall mean the date on which this Consent Decree is entered by the Court, in accordance with the definition provided in Section XIV of this Consent Decree (Effective Date);

m.    "Facility" shall mean Defendant's Summers Facility and Original Summers Facility, as defined herein;

n.    "Groundwater Monitoring Well" or "GMW" shall mean a well designed and installed to obtain representative groundwater quality samples and hydrogeologic information, as set forth in NRCS Conservation Practice Standard Code 353 (Monitoring Well);

o.    "Holcraft" shall mean a subset of buildings at the Summers Facility owned and operated by Defendant and located to the east and adjacent to the Original Summers Facility; specifically ten buildings and two hoop houses of free-range organic layers with approximately 24,000 laying hens whose eggs are hand gathered at all twelve structures and transported to the Summers processing plant to be washed, sorted, and packaged.

p.    "Lagoon" shall mean, for purposes of this Consent Decree only, a Retention Control Structure, as defined herein;

q.    "the Lagoons" shall mean the two on-site Lagoons located at the Old Summers Facility and Summers Facility, consisting of "Holding Pond 1" and "Holding Pond 2," as those structures are identified in the Closure Plan for the Summers Facility;

r.    "Lagoon Closure Requirements" shall mean, for purposes of this Consent Decree only, the requirements set forth in the Closure Plan relating to cleanout and closure of the Lagoons;

9

s.      "Liquid Animal Waste Management System" shall mean any system used for the collection, storage, distribution or disposal of animal waste in liquid form generated by a confined animal operation.

t.      "Manure" shall mean feces and/or urine excreted by animals. Manure includes bedding, compost, raw materials and other materials that have been commingled with Manure;

u.      "Nutrient Management Plan" shall mean a written plan developed for a specific facility that addresses the amount, source, placement, form, and timing of the application of all nutrients and soil amendments in accordance with   Arkansas State law, including but not limited to Title 22 of the Arkansas Natural Resources Commission;

v.      "NRCS" shall mean the Natural Resources Conservation Service, an Agency within the United States Department of Agriculture, and any of its successor departments or agencies;

w.      "Original Summers Facility" shall mean the Summers Facility as it existed from May 2002 until May 2008, prior to conversion to the present operations at the Summers Facility, which consisted of five cage layer houses, confining a total of 300,000 birds, utilized a liquid waste management system in operations, including the use of two on-site Lagoons (the Lagoons), and operated an on-site egg processing plant;

x.      "Paragraph" shall mean a portion of this Decree identified by an arabic numeral;

y.      "Parties" shall mean the United States, the State of Arkansas, and Defendant, collectively;

10

      z.      "Regulation 5 Permit" shall mean a permit for a liquid animal waste management system issued by ADEQ pursuant to APC&EC Regulation No. 5.

      aa.     "Retention Control Structure" or "RCS" shall mean any basins, ponds, pits, tanks, and lagoons used to store and/or treat Manure, litter, Waste, wastewater, and Sludge. RCS does not include conveyance systems such as irrigation piping or ditches that are designed and maintained to convey but not store any Manure, litter, or water;

      bb.     "Section" shall mean a portion of this Decree identified by a roman numeral;

      cc.     "Sludge" shall mean, for purposes of this Consent Decree only, solid, semi-solid, or slurry waste generated during the treatment of and/or storage of any Waste or Egg Washwater; this term includes materials resulting from treatment, coagulation, or sedimentation of waste in a RCS;

      dd.     "State" shall mean the State of Arkansas, acting on behalf of ADEQ

      ee.     "State Act" shall mean the Arkansas Waste and Air Pollution Control Act, Ark. Code Ann. §§ 8-4-217(a)(1) and (a)(2);

      ff.     "Summers Facility" or "Facility" shall mean the site of the former "Original Summers Facility," as it has existed since May 2008, which is as an active chicken-egg-production facility located at 24185 Mill Road, Summers, Washington County, Arkansas 72769, owned and operated by Defendant, that currently is a cage-free organic operation with 82,500 birds utilizing a dry litter system and also includes the Holcraft operations;

      gg.     "United States" shall mean the United States of America, acting on behalf of EPA;

hh.    "Waste" shall mean, for purposes of this Consent Decree only, Manure, animal excrement, animal carcasses, or any other waste associated with the confinement of animals from an animal feeding operation.

### IV.    COMPLIANCE REQUIREMENTS

8.    Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section VIII (Force Majeure) of this Consent Decree for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

9.    The major compliance requirements specified in this Section are summarized with associated deadlines for ease of reference in Table 1, Appendix B. Should any discrepancy arise as a result of a summarized description, the terms of the Paragraphs in this Section IV (Compliance Requirements) shall control.

10.    Approval of Deliverables. Defendant shall submit any plan, report, or other item that it is required to submit for approval pursuant to this Consent Decree to EPA and ADEQ. Unless specifically indicated otherwise by the terms of this Consent Decree, EPA, upon consultation with ADEQ, may thereafter approve the submission or decline to approve it, in whole or in part, as follows:

a.    If the submission is approved pursuant to this Paragraph, EPA will notify Defendant of the approval and Defendant shall take all actions required by the

12

plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.

b.  If the submission is disapproved, in whole or in part, pursuant to this Paragraph Defendants shall, within ten (10) Days of receiving EPA's written comments, unless some other time period is indicated otherwise in EPA's written disapproval, either: (i) alter the submission consistent with EPA's written comments and resubmit the plan, report, or other item, or disapproved portion thereof, to EPA and ADEQ for final concurred approval, or (ii) respond to EPA and ADEQ with comments or additional information, if so requested; or (iii) submit the matter for dispute resolution under Section IX (Dispute Resolution) of this Decree.  Upon receipt of final approval of the submission, or upon completion of the submission pursuant to dispute resolution, Defendant shall implement the submission in accordance with the schedule in the approved submission.

**A.    WELL INSTALLATION AND GROUNDWATER MONITORING**

11.    Prior to undertaking any Lagoon cleanout activities pursuant to Section IV.B (Compliance Requirements – Lagoon Closure), Defendant shall install Groundwater Monitoring Wells (GMWs) as provided in Section 6 (Monitoring, Testing, and Evaluation) of the Closure Plan (Appendix A).  In preparation for Defendant's installation of a minimum of three (3) GMWs at the Summers Facility, as required under this Consent Decree,  and no later than June 28, 2013, Defendant shall confer with EPA, via telephonic or electronic means using contact information previously provided to Defendant, on Defendant's  proposed methodology for identifying suitable GMW installation locations, consistent with the requirements of  Paragraph

13

12 of this Section, and obtain EPA approval to implement that proposed methodology or an alternate proposed methodology discussed with EPA. If the conference between Defendant and EPA required under this Paragraph occurs via telephonic means, then within three (3) business days of the telephonic conference, Defendant shall submit to EPA by electronic means at e-mail addresses provided to Defendant, a summary of the EPA-approved proposed methodology for identifying suitable GMW locations, as discussed in the conference.

12.     No later than July 10, 2013, and prior to undertaking any lagoon cleanout activities pursuant to Section IV.B (Compliance Requirements – Lagoon Closure), Defendant shall install, at a minimum, one GMW up-gradient and two GMWs down-gradient of the Lagoons, at GMW locations selected by using the EPA-approved proposed methodology for identifying suitable GMW locations, pursuant to Paragraph 11, above, and in accordance with the requirements of Section 6 (Monitoring, Testing, and Evaluation) of the Closure Plan (Appendix A). Defendant shall determine gradient by direct push technology (DPT) or another method approved by EPA in writing, by electronic means or otherwise, in a timely manner upon request by Defendant, prior to well installation. Defendant shall provide EPA and ADEQ with a minimum of three (3) business Days advance notification of any GMW field activities under this Paragraph. Defendant shall report the results of any installation activities to EPA and ADEQ, pursuant to Paragraph 44. Within five (5) business days of receiving any GMW Installation Report required under Paragraph 44, EPA shall review the Report and notify Defendant if the selected GMW installation location(s) are not consistent with the Groundwater Monitoring requirements of this Consent Decree and, if so, the requested appropriate relief, including but not limited to adding GMW locations. Upon receipt of any such notification from EPA, Defendant shall implement the requested appropriate relief within fourteen (14) Days.

13.     Following the installation of the GMWs, and no later than July 17, 2013,
Defendant shall, as provided in Section 6 (Monitoring, Testing, and Evaluation) of the Closure
Plan (Appendix A): (a) complete a survey of the top of casing to a common benchmark, and (b)
collect static fluid levels for each well and sample each well to establish an initial baseline that
includes: phosphorus, ammonium, chloride, nitrates, electrical conductivity, fecal coliform (total
enumeration), arsenic and pH.  Defendant shall provide EPA and ADEQ with a minimum of
three (3) business Days advance notification, in writing, by electronic or other means, prior to
conducting any survey and sampling activities under this Paragraph.  Defendant shall report the
results of any such baseline survey and sampling to EPA and ADEQ, pursuant to Paragraph 44,
for EPA review and comment, with ADEQ concurrence, in a timely manner.

14.     Beginning within ninety (90) days from the baseline sampling event required
under Paragraph 13, and no later than October 17, 2013, Defendant must monitor and sample
each of the GMWs on a quarterly (every 90 Days) schedule as provided in Section 6
(Monitoring, Testing, and Evaluation) of the Closure Plan (Appendix A).  Defendant shall
provide EPA and ADEQ with a minimum of three (3) business Days advance notification, in
writing, by electronic or other means, prior to conducting any quarterly monitoring and sampling
activities under this Paragraph.  As provided in Section 6 of the Closure Plan, Defendant shall
report the results of any quarterly monitoring and sampling to EPA and ADEQ, pursuant to
Paragraph 44 for EPA review and comment, with ADEQ concurrence.

15.     Notwithstanding the specification in Section 6 (Monitoring, Testing, and
Evaluation) of the Closure Plan (Appendix A) that Defendant is to continue quarterly monitoring
and sampling for at least three (3) years, the terms of this Paragraph shall supersede that portion
of the Closure Plan and control the length of the quarterly groundwater monitoring and sampling

15

activities required under Paragraph 14.  Defendant shall continue quarterly monitoring following

EPA's approval of the Final Lagoon Closure Report, as required under Paragraph 26,  until

results demonstrate four consecutive "clean" sampling events (i.e., below the thresholds

specified in Section 6 of the Closure Plan.   If after three (3) years of quarterly sampling (i.e., at

least 13 sampling events) any of the groundwater samples remain greater than the threshold

values for one or more of the parameters identified in Section 6 of the Closure Plan, EPA or the

State may require Defendant to submit a plan for further investigation and remediation of the soil

and/or groundwater, and, upon EPA approval, with ADEQ concurrence, implement that plan.

16.     If at any time during the quarterly monitoring and sampling period required under

Paragraph 15 Defendant contends that the threshold values for one or more of the parameters

identified in Section 6 of the Closure Plan are not being met due to the existence and

contribution of nutrients from some source other than Defendant's property or the Lagoons,

Defendant may submit a statement in support of this contention, including supportive documents

or other information, to EPA and ADEQ and request appropriate relief.  EPA and ADEQ shall

timely review any such submission under this Paragraph to evaluate whether sampled levels may

have been affected by activities of a source other than Defendant, and, if EPA and ADEQ agree

with Defendant's contention, EPA shall make a determination as to what relief is appropriate.

Should any dispute arise as to whether failure to consecutively meet the threshold values for one

or more of the parameters identified in Section 6 of the Closure Plan is attributable to a source

other than Defendant, the terms of Section IX (Dispute Resolution) shall control.

17.     When Defendant considers that it has achieved the four consecutive clean

sampling events in accordance with Paragraph 15 and takes a position that no further

groundwater monitoring is necessary, Defendant shall submit a request in writing to EPA and the

16

ADEQ, at the addresses provided under Section XIII (Notices) and via electronic means, for approval to terminate groundwater monitoring and plug the GMWs in accordance with all applicable laws and regulations.  EPA and ADEQ shall timely review this request in accordance with the approval of deliverables provisions of Paragraph 10.

**B.    LAGOON CLOSURE**

18.    Defendant shall not utilize the Lagoons for any purpose other than to initiate and carry out the Lagoon Closure Requirements and any other applicable requirements under to this Consent Decree.

19.    Defendant shall perform the Lagoon Closure Requirements at the Summers Facility to close the Lagoons in accordance with requirements set forth in this Section and Appendix A.

20.    After Defendant has completed the GWM installation and monitoring requirements of Paragraphs 11-13 of Section IV.A (Compliance Requirements - Well Installation and Groundwater Monitoring) of this Consent Decree, Defendant shall notify EPA and ADEQ of its intent to begin Lagoon excavation and cleanout activities, in accordance with the Lagoon Closure Requirements, and await EPA's approval before commencing such activities on the Lagoons.

21.    Defendant shall provide EPA and ADEQ a minimum of three (3) Days notice before commencing the actual excavation and cleanout of the Lagoons.  The excavation and cleanout of the Lagoons shall begin after completion of the baseline survey and sampling of the requisite GWMs, pursuant to Paragraph 13, above, and, in any event, no later than ~~October~~ 1, December 2013.

17

22.     Defendant may land apply the excavated and cleaned out contents of the Lagoons in compliance with the applicable Nutrient Management Plan requirements and the terms of Section IV.C (Compliance Requirements – Nutrient Management Plan and Land Application) of this Consent Decree.

23.     Defendant shall complete the Lagoon Closure Requirements no later than ~~December 31, 2013~~. March 1, 2014 (JRE)

24.     Defendant shall notify EPA and ADEQ at least fourteen (14) Days prior to the date that Defendant intends to have completed the Lagoon Closure Requirements required under this Consent Decree, as fully set forth in the Closure Plan (Appendix A), to enable EPA and ADEQ to plan for and begin inspection of the lagoon closure and evaluate compliance with the Lagoon Closure Requirements.

25.     Within seven (7) Days of Defendant's receipt of soil analytical reports demonstrating compliance with the target lagoon soil parameters, set forth in Section 6 (Monitoring, Testing, Evaluation) of the Closure Plan (Appendix A), Defendant shall notify EPA and ADEQ via email and hard copy that it has met these cleanup parameters at each of the Lagoons for all of the identified cells in Figure 2 of the Closure Plan (Appendix A).  Defendant shall submit this notification statement along with copies of the soil analytical reports as supporting documentation, and shall simultaneously request permission to proceed with the development of the Final Lagoon Closure Report for submission pursuant to Paragraph 44.c.

26.     Upon receipt, EPA and ADEQ shall timely review Defendant's request to proceed with the Final Lagoon Closure Report, pursuant to Paragraph 25, immediately above, and EPA shall notify Defendant, in writing, of any outstanding action for completion prior to proceeding with the Final Lagoon Closure Report and/or of approval of Defendant's request to proceed.

18

Once EPA, with ADEQ's concurrence, has approved Defendant's request to proceed with the Final Lagoon Closure Report, EPA shall notify Defendant in writing.  Within sixty (60) Days of receipt of this approval, Defendant shall submit the Final Lagoon Closure Report pursuant to Paragraph 44.

27.   Upon receipt of the Final Lagoon Closure Report required under this Section, EPA and ADEQ will review the submittal and respond in the following manner, as applicable:

a.   If EPA, upon consultation with ADEQ, determines that the actions taken comply with the Lagoon Closure Requirements of this Consent Decree, EPA shall so notify Defendant via email or hard copy within thirty (30) Days of receipt of Defendant's Final Lagoon Closure Report that the Final Lagoon Closure Report is complete and the actions taken comply with the Lagoon Closure Requirements of this Consent Decree.

b.   If EPA, upon consultation with ADEQ, determines that Defendant has not satisfactorily completed the applicable requirements of this Consent Decree pertaining to lagoon closure, then, within thirty (30) Days of receipt of Defendant's Final Lagoon Closure Report, EPA shall so notify Defendant via email or hard copy, at the addresses specified in Section XIII (Notices), identifying the outstanding applicable requirements for lagoon closure and requesting an expedited schedule for completion.  Within fourteen (14) Days of Defendant's receipt of such notification and request by EPA, Defendant will notify EPA and ADEQ in writing of an expedited schedule for completion, which schedule shall be subject to approval by EPA and ADEQ.  Immediately upon approval of such schedule by EPA and ADEQ, Defendant will take the

19

appropriate steps to complete any applicable requirements that remain to comply with the Lagoon Closure Requirements of this Consent Decree in accordance with the approved schedule.

**C.   NUTRIENT MANAGEMENT PLAN AND LAND APPLICATION**

28.     Defendant shall implement the required Nutrient Management Plan and land application procedures required for the closure of the Lagoons and for the continued operation of the Summers Facility, as set forth in the Closure Plan (Appendix A), and with the requirements of any subsequent Nutrient Management Plan issued for the Summers Facility prior to the termination of this Consent Decree, pursuant to Section XVII (Termination).

29.     As set forth in Section 1 (Background and Site Information) of the Closure Plan (Appendix A), to properly land apply all of the Lagoons' contents removed during Lagoon cleanout and excavation activities, Defendant will need to utilize more land application areas than were available to Defendant for incorporation into the Closure Plan at the time it was issued.  Defendant may utilize other sites as additional land application areas to land apply some of the Lagoons' contents only if those sites are covered by other existing Nutrient Management Plans and only in compliance with:  the terms of a valid land agreement between Defendant and the respective site owner(s); the land application rates required by the site owner's existing Nutrient Management Plan(s); and the terms of Paragraph 30, immediately below.

30.     If Defendant intends to land apply some of the Lagoons' contents by utilizing additional land application areas as set forth in Paragraph 29, above, Defendant must notify ADEQ and await ADEQ approval before proceeding with such land application.  To so notify ADEQ, Defendant must submit in writing to ADEQ, pursuant to Section XIII (Notices) and

additionally by electronic means at an appropriate ADEQ e-mail address previously provided to Defendant, the following information, at a minimum, in advance of the relevant land application date:

    a.   The Amount of Waste to be land applied;

    b.   The Soils Analysis for the land application field;

    c.   The P-Index for the land application field;

    d.   The land use agreement between Defendant and the land application field owner.

    31.    If Defendant submits the information required under Paragraph 30 to ADEQ after ADEQ has received Defendant's Regulation 5 Permit application pursuant to Paragraph of 35 this Consent Decree, Defendant shall make the information submission as part of a request for a minor modification of Defendant's Regulation 5 Permit seeking to add the additional land application areas by incorporation. Upon receipt of this information, ADEQ shall within ten (10) Days notify Defendant in writing by electronic means, at an appropriate e-mail address previously provided by Defendant, whether it may proceed with the land application at the identified field.

    32.    Defendant shall at all times keep a current and updated copy of the "Field Information and Manure Application" recordkeeping form maintained under Section 5 (Recordkeeping Forms) of the Closure Plan (Appendix A). Defendant shall provide a copy of this form in its most current state to EPA and ADEQ at any point upon the request of EPA and/or ADEQ. Additionally, Defendant shall provide a copy of this form as a required component of the Final Lagoon Closure Report, as set forth in Paragraph 44.c.iii.

    33.    In addition to the land application records maintained and submitted pursuant to Paragraph 26, immediately above, Defendant shall maintain a record of the following

21

information for each site that received contents from the Lagoons for land application, and shall provide this related information to EPA and ADEQ concurrently with any submission required under Paragraph 26:

    a.   the landowner name and field location associated with each "Field ID" listed in the "Field Information and Manure Application" recordkeeping form maintained under Section 5 (Recordkeeping Forms) of the Closure Plan (Appendix A);

    b.   For any waste provided to an off-site recipient, a description of any contracts or agreements utilized or obtained between Defendant and the landowners identified under this Paragraph to allow for the land application of lagoon contents from the Summers Facility on the identified field(s);

    c.   the additional following information, provided in tabular format:

        i.   <u>Key Dates</u>:  A listing of the following dates associated with any particular land application of lagoon contents:  date of removal of material from lagoon; date of transport; date of receipt by landowner of receiving field;

        ii.   <u>Volume Applied</u>:  Identification of the volume of material provided, preferably quantified in tons, to the landowner for application to each identified field;

        iii.   <u>Available Acreage</u>:  Identification of the number of acres allotted as available by the receiving field for application of the lagoon contents.

22

**D.     MORTALITY MANAGEMENT**

34.     Defendant shall comply with the appropriate Mortality Management
Requirements in Arkansas Livestock and Poultry Commission regulations in the operation of the
Summers Facility.

**E.     PERMITS**

35.     Defendant shall apply for a Regulation 5 Permit by submitting an application to
ADEQ no later than June 21, 2013.  The Regulation 5 Permit application shall include a copy of
the Closure Plan, any other required documentation under Arkansas State law, and a statement
from Defendant clearly indicating that Defendant is applying for the Regulation 5 Permit for the
limited purpose of closing the Lagoons.  The Regulation 5 Permit, if issued, shall be terminated
by ADEQ when the closure of the Lagoons has been completed and the Final Lagoon Closure
Report has been subsequently approved by both ADEQ and EPA.

36.     If ADEQ issues a Regulation 5 Permit as a result of Defendant's application
submitted under Paragraph 35, Defendant's use of that Regulation 5 Permit for any purpose other
than to carry out closure of the Lagoons is a violation of this Consent Decree and may subject the
Regulation 5 Permit to termination by ADEQ.

**F.     SEPTIC SYSTEM AND LEACHFIELD**

37.     Defendant shall comply with the terms of ADEQ Permit No. 5164-W, issued for
the construction and operation of a septic system and leach field at the Summers Facility, to
handle the disposal and management of the Egg Washwater generated during the egg processing
component of the Summers Facility operations.

38.     Should an unauthorized discharge occur from Defendant's use of the septic
system and leachfield discussed in Paragraph 37, immediately above, in addition to any actions

required under the terms of Defendant's ADEQ Permit, Defendant shall report any such

unauthorized discharges in accordance with Paragraph 44.e of Section VI (Reporting

Requirements) of this Consent Decree.

      39.     In the event that the septic system is not operational or not functioning properly,

Defendant shall use a professional pumping service to collect and haul away the Egg Washwater

until complete functionality of the septic system is restored.  Should such an operational or

functional upset occur, Defendant shall report such non-operational or malfunctioning

occurrence in accordance with Paragraph 44.f of Section VI  (Reporting Requirements) of this

Consent Decree.

## V.    CIVIL PENALTY

      40.    <u>Civil Penalty.</u>  No later than thirty (30) Days after the Effective Date of this

Consent Decree, Defendant shall pay the sum of $10,000.00,  as a civil penalty, together with

interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate

specified in 28 U.S.C. § 1961 as of the date of lodging.  Defendant shall pay the civil penalty as

follows:

        a.   Defendant shall pay $7,500.00 total to the United States.  Payment shall be made

           by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice

           in accordance with written instructions to be provided to Defendant, following

           lodging of the Consent Decree, by the Financial Litigation Unit of the U.S.

           Attorney's Office for the Western District of Arkansas, located at 414 Parker

           Avenue, Fort Smith, Arkansas, 72901, with a telephone number of (479) 783-

           5125.  At the time of payment, Defendant shall send a copy of the EFT

           authorization form and the EFT transaction record, together with a transmittal

letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Arkansas Egg Co., Inc.*, and shall reference the civil action number and DOJ case number 90-5-1-1-09991, to the United States in accordance with Section XIII of this Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio  45268

b.  Defendant shall pay $2,500.00 total to the State of Arkansas.  Payment shall be made by check, payable to the Arkansas Department of Environmental Quality, referencing Action #7338 and mailed to:

> Fiscal Division, ADEQ
> 5301 Northshore Drive
> North Little Rock, AR 72118-5317

41.  Defendant shall not deduct the civil penalty paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal, state or local income tax.

42.  Defendant, through its President, Michael Cox, contends that Defendant has a limited ability to pay a civil penalty under this Consent Decree and, as such, submitted financial information, including documents listed in Appendix C, to the United States to support this contention.  The United States has reviewed this information and, in reliance on the truth and completeness of that information and Defendant's representations, the United States and Arkansas enter into this Consent Decree with Defendant, inclusive of the penalty amount required under this Section V (Civil Penalty) and the penalties potentially incurred under Section VII (Stipulated Penalties), based upon Defendant's limited ability to pay a civil penalty.

25

Defendant, by signing this Consent Decree, certifies to the best of his knowledge, information and belief, that the financial data and information provided to the United States and identified in Appendix C to this Consent Decree are true, accurate, and complete.

43.     The United States' and the State of Arkansas' entry into this Consent Decree is made in express reliance and is dependent upon Defendant's financial certification contained in Paragraph 42. If, at any time, the United States determines that Defendant's financial certification was false, inaccurate, or incomplete as to any representation, the United States and Arkansas reserve the right to petition the Court for further relief from Defendant and, if the United States deems appropriate, to institute further action based on the terms of this Consent Decree and any violation thereof. Should the United States and Arkansas make such a petition for further relief or institute further action, Defendant waives its right to assert any statute of limitations, laches, waiver, or estoppels defenses to such petition or such further action. This reservation shall be made in addition to an not in place of any remedies the United States may have for false statements made to the United States, including but not limited to the sanctions provided by 18 U.S.C. § 1001.

## VI.     REPORTING REQUIREMENTS

44.     Defendant shall submit to the United States and the State of Arkansas, as provided under Section XIII (Notices), the following reports:

   a.   GMW Installation Reports. Pursuant to Paragraph 12 , Defendant shall install
        GMWs in accordance with the Closure Plan. Within seven (7) Days of the
        completion of any installation activities under Paragraph 12, Defendant shall
        submit:

        i.   A complete description of the installed GMW locations;

ii. If the installed GMW locations are inconsistent with locations that would result from implementing Defendant's proposed methodology for identifying suitable GMW installation locations, as previously approved by EPA pursuant to Paragraph 11, Defendant shall explain why the locations were selected;

iii. the associated driller's reports and the results of hydraulic conductivity tests;

b. <u>Baseline Survey GMW Monitoring Reports and Quarterly GMW Monitoring Reports</u>. Pursuant to Paragraph 13, Defendant shall submit a report of baseline GMW survey and samples, and pursuant to Paragraphs 14 and 15, Defendant shall continue GMW sampling and monitoring on a quarterly basis. Any such baseline GMW reports or Quarterly GMW monitoring reports, shall include, at a minimum:

i. depth to groundwater from top of casing;

ii. methodology of groundwater collection;

iii. copies of laboratory analytical results, including chains of custody; and,

iv. potentiometric surface map of groundwater;

c. <u>Final Lagoon Closure Report</u> – Pursuant to Paragraph 26, Defendant shall submit a Final Lagoon Closure Report within sixty (60) Days of approval from EPA, with concurrence from ADEQ, to proceed with development of the Final Lagoon Closure Report. The Final Lagoon Closure Report shall include the following:

27

i. A copy of the completed version of the "Pumping or Clean-Out Events" recordkeeping form maintained under Section 5 (Recordkeeping Forms) of the Closure Plan (Appendix A);

ii. Copies of all laboratory analyses of lagoon contents removed, including chains of custody;

iii. A copy of the most currently completed version of the "Field Information and Manure Application" recordkeeping form maintained under Section 5 (Recordkeeping Forms) of the Closure Plan (Appendix A), along with the additional recordkeeping information on land application activities maintained pursuant to Paragraph 33 under Section IV.C (Nutrient Management and Land Application), of this Consent Decree;

iv. A summary table or chart describing all steps taken to carry out the closure of the Lagoons and any required post-closure obligations, with such summary table or chart including, at a minimum:

    1. A description of each step or action taken;

    2. reference to all associated maps, analytical data, photographs or other documents or information in support of each step;

    3. the date that each step or action was initiated and completed;

    4. the results obtained from each step or action taken;

v. A copy of supporting documents identified in the table or chart required under this subparagraph b.ii;

vi. A copy of the land application records and additional land application record information required under Paragraph 32 of this Consent Decree;

28

vii. Notice and a Certification of Completion of Lagoon Closure, which must:

    1. Clearly indicate, by title, that it is the Notice and Certification of Completion of Lagoon Closure of Arkansas Egg Company, Inc.;

    2. Include a reference to the compliance obligations under this Consent Decree, including the case title and associated Civil Action Number for the Complaint filed concurrently with this Consent Decree;

    3. Outline all actions taken by Defendant to complete closure of the Lagoons by cross-referencing the applicable requirements of Sections IV.A  (Compliance Requirements – Well Installation and Groundwater Monitoring) and IV.IV.B  (Compliance Requirements – Lagoon Closure) of the Consent Decree;

    4. Contain the certification language required under paragraph 46 of this Consent Decree and be signed by the signatory required under that same Paragraph;

viii. A signed statement by a Professional Engineer registered in the State of Arkansas, or a qualified groundwater scientist, stating that the facility has met all the threshold values  set forth in Section 6 (Monitoring, Testing, Evaluation) of the Closure Plan (Appendix A),  and complied with all other Lagoon Closure Requirements;

ix. The Report shall also describe the post-closure performance including the integrity and effectiveness of the final stabilization method identified in Appendix XX;

d.  <u>Status of Regulation 5 Permit Report</u>.  After Defendant applies for a Regulation 5 Permit, pursuant to Paragraph 35 of Section IV.E (Permits) of this Consent Decree, Defendant shall report any change in status of Defendant's pending Regulation 5 Permit application, whether approval, denial, withdrawn, or otherwise, within seven (7) Days of Defendant's receipt of notification on the status of the application;

e.  <u>Septic System and Leachfield Discharge Report</u>.  Should an unauthorized discharge occur from the septic system and leachfield discussed in Paragraph 37 of Section IV.F (Septic System and Leachfield) of this Consent Decree, in addition to any actions required under the terms of Defendant's ADEQ Permit, Defendant shall report the unauthorized discharge in writing to EPA and ADEQ within five (5) Days of such occurrence.

f.  <u>Septic System Non-Operational or Malfunction Report</u>.  Should any operational or functionality upsets occur with the septic system discussed in Paragraph 37 of Section IV.F (Septic System and Leachfield) of this Consent Decree, in addition to any actions required under the terms of Defendant's ADEQ Permit, Defendant shall report the non-operational or malfunctioning occurrence in writing to EPA and ADEQ within five (5) Days of such occurrence and identify any steps taken or planned to remedy the occurrence.

g.  <u>Reports of Violations</u>.  If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States and the State of Arkansas of such violation and its likely duration, in writing, within ten (10) working Days of the Day Defendant first becomes

30

aware of the violation, or should reasonably have become aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within thirty (30) Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section VIII (Force Majeure) of this Consent Decree.

h. <u>Reports of Immediate Threat</u>. Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and ADEQ orally and by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Defendant first knew of, or should have known of, the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

45. All reports shall be submitted to the persons designated in Section XIII (Notices) of this Consent Decree.

31

46.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

47.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

48.     Any information provided pursuant to this Consent Decree may be used by the United States or the State of Arkansas in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII.   STIPULATED PENALTIES

49.     As specified in this Section of the Consent Decree, Defendant shall be liable for stipulated penalties to the United States and the State of Arkansas for violations of this Consent Decree, unless excused under Section VIII (Force Majeure), or waived pursuant to Paragraph 53 of this Consent Decree. A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

32

50.     Compliance Requirements. The following Stipulated Penalties apply to violations of compliance milestones required under this Consent Decree:

a.  Late Payment of Civil Penalty.  If Defendant fails to pay the civil penalty required to be paid under Section V of this Consent Decree (Civil Penalty) when due, Defendant shall pay a Stipulated Penalty of $500 per Day for each Day that the payment is late.

b.  Unnoticed Transfers of Summers Facility.  If Defendant fails to provide a copy of this Consent Decree to any proposed transferee or fails to provide written notice to the Plaintiffs of the prospective transfer, as required by Paragraph 4 of this Decree, Defendant shall pay a Stipulated Penalty of $250 per Day per violation.

c.  Failure to Submit Permit Application.  If Defendant fails to submit an application for a Regulation 5 Permit as required under Section IV.E (Permits) of this Decree, the stipulated penalty shall be set on an interval basis, as follows:

| Period of Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st – 21st Day | $100 |
| 22nd – 43rd Day | $250 |
| 44th Day and each Day thereafter | $500 |

d.  Inadequate Lagoon Closure. If Defendant fails to implement or to comply with any requirement to close the Lagoons in accordance with the Closure Plan ( Appendix A), and as required by Section IV.B of this Decree (Compliance

33

Requirements, Lagoon Closure), the stipulated penalty shall be set on an interval basis, as follows:

| Period of Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st – 21st Day | $250 |
| 22nd– 43rd Day | $500 |
| 44th Day and each Day thereafter | $1,000 |

e. Inadequate Groundwater Monitoring. If Defendant fails to implement or to comply with any requirement to install, survey, sample, and monitor GMWs in accordance with Section 6 (Monitoring, Testing, and Evaluation) of the Closure Plan (Appendix A) and as required by Section IV.A of this Decree (Compliance Requirements, Well Installation and Groundwater Monitoring), the stipulated penalty shall be set on an interval basis, as follows:

| Period of Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st – 21st Day | $250 |
| 22nd– 43rd Day | $500 |
| 44th Day and each Day thereafter | $1,000 |

f. Inadequate Disposal or Land Application. If Defendant fails to properly dispose of or land apply Waste, Wastewater, Manure, or Sludge in violation of the Closure Plan (Appendix A), and as required by Paragraph IV.C of this Decree (Compliance Requirements, Nutrient Management Plan and Land Application), Defendant shall pay a Stipulated Penalty of $500 per Day per violation.

34

g.   Inadequate Mortality Management. If Defendant fails to comply with the mortality management requirements of Section IV.D of this Decree (Compliance Requirements, Mortality Management), Defendant shall pay a Stipulated Penalty of $100 per Day  per violation.

h.   Improper Operation of Septic System and Leachfield.  If Defendant fails to comply with the Septic System and Leachfield requirements in to Section IV.F of this Decree (Compliance Requirements, Septic System and Leachfield), Defendant shall pay a Stipulated Penalty of $250 per Day per violation.

51.   Reporting Failures. If Defendant fails to timely submit any report or submittal required by Section VI  (Reporting Requirements) of this Consent Decree, the stipulated penalty shall be set on an interval basis, as follows:

| Period of Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st – 21st Day | $75 |
| 22nd – 43rd Day | $150 |
| 44th Day and each Day thereafter | $200 |

52.   All Other Requirements. The following Stipulated Penalties apply to other violations of this Consent Decree, for which Stipulated Penalties are not otherwise set forth in Paragraphs 50-51:

a.   Failure to Permit Entry.  If Defendant fails to permit entry to EPA, ADEQ, or their authorized representatives to the Facility, as required by Section X (Information Collection and Retention) of this Consent Decree, Defendant shall pay a Stipulated Penalty of $500 per Day until the day on which Defendant

35

notifies EPA or ADEQ that access is granted.

  b. <u>Violation of Other Requirements</u>. If Defendant violates any other requirement or provision of this Consent Decree, Decree, for which Stipulated Penalties are not otherwise set forth in Paragraphs 50-51 or this Paragraph, Defendant shall pay a stipulated penalty of $250 per Day per violation.

53. <u>Stipulated Penalties' Accrual</u>. Stipulated penalties will begin to accrue on the Day after performance is due or the Day a violation occurs, whichever is applicable, and will continue to accrue until performance is satisfactorily completed or the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

54. <u>Waiver of Payment.</u> After consultation, the United States and/or the State of Arkansas may, in its/their unreviewable discretion, reduce or waive payment of any portion or all of the stipulated penalties that may be due to it/them under this Consent Decree.

55. <u>Demand for Stipulated Penalties.</u> Either the United States or the State of Arkansas, or both, may make a demand for payment for stipulated penalties. The United States shall consult with the State of Arkansas prior to making any written demand for stipulated penalties and the State of Arkansas shall similarly consult with the United States prior to making any written demand for stipulated penalties. If the Plaintiffs both pursue making a demand for stipulated penalties owing under this Section, the Parties will jointly send a written demand to Defendant. If only the United States or only the State of Arkansas pursues making a demand for stipulated penalties, the demanding party may seek payment of stipulated penalties owing under this Section by sending a written demand to Defendant, with a copy simultaneously sent to the Plaintiff who elects not to make a corresponding demand. A written demand for the payment of stipulated penalties will identify: (i) the particular violation(s) to which the stipulated penalty

36

relates; (ii) the stipulated penalty amount that the United States and/or the Applicable State Party

is demanding for each violation (as can be best estimated); (iii) the calculation method

underlying the demand; and, (iv) the grounds upon which the demand is based.

56.     <u>Stipulated Penalties Payment Due Date.</u>  Defendant shall pay any stipulated

penalty demanded by the United States and/or the State of Arkansas no later than thirty (30)

Days after Defendant's receipt of the corresponding written demand, unless the demand is

disputed through compliance with the requirements of Section IX (Dispute Resolution) of this

Consent Decree.

57.     <u>Allocation of Stipulated Penalties Among the United States and the Applicable</u>

<u>State Parties.</u>  Defendant shall pay stipulated penalties provided under this Consent Decree upon

receiving the written demand of the United States, the State of Arkansas, or both Plaintiffs, and

in no case later than the due date set forth in Paragraph 56.  When the United States and the State

of Arkansas make a joint demand for payment of a stipulated penalty, Defendant shall pay fifty

percent (50%) of the total stipulated penalty amount due to the United States, and fifty percent

(50%) to the State of Arkansas, in accordance with the payment procedures set forth in

Paragraph 58.  When only one of the Plaintiffs, either the United States or the State of Arkansas,

makes a demand for payment of a stipulated penalty and the other Plaintiff elects not to join in

that demand, Defendant shall pay one-hundred percent (100%) of the total stipulated penalty

amount due to the demanding Plaintiff, in accordance with the payment procedures set forth in

Paragraph 58.

58.     <u>Manner of Payment of Stipulated Penalties.</u>  Stipulated penalties owing to the

United States and/or the State of Arkansas shall be respectively paid in the manners set forth and

with the confirmation notices required by subparagraph a of Paragraph 40 of Section V (Civil

37

Penalty), except that the transmittal letter shall state that the payment is for stipulated penalties and shall identify the violation(s) to which the stipulated penalties payment relates.

59.     <u>Disputes over Stipulated Penalties</u>.  Stipulated penalties shall continue to accrue as provided in Paragraph 53, during any Dispute Resolution, but need not be paid until the following:

        a.     If the dispute is resolved by agreement with or by a decision of EPA and/or ADEQ, that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with Interest, to the United States and/or the State of Arkansas within thirty (30) Days of the effective date of the agreement or the receipt of the EPA's or ADEQ's decision or order.

        b.     If the dispute is appealed to the Court and the EPA and/or ADEQ prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

        c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with Interest, within fifteen (15) Days of receiving the final appellate court decision.

60.     No amount of the stipulated penalties paid by Defendant pursuant to this Consent Decree shall be used to reduce Defendant's federal or state tax obligations.

61.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall

be construed to limit the United States or the State of Arkansas from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

62.     Subject to the provisions of Section XI of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State of Arkansas for a violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree also is a violation of the CWA, the State Act, or another applicable state or federal statutory or regulatory requirement, Defendant shall be allowed a credit for any stipulated penalties paid (whether to the United States and/or the State of Arkansas), against any statutory penalties imposed for such violation.

## VIII.   <u>FORCE MAJUERE</u>

63.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

64.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, Defendant shall provide notice to the United States and the State of Arkansas orally or by electronic or facsimile transmission as soon as possible, but not

later than four (4) Days after the time Defendant first knew of, or by the exercise of due

diligence should have known of, the event, whether or not the event is a claimed force majeure

event. Additionally, regarding any such event, Defendant shall also provide written notice to the

United States and the State of Arkansas, as provided in Section XIII (Notices), within ten (10)

Days of the time that Defendant first knew of, or by the exercise of due diligence should have

known of, the occurrence of the event. The written notice shall include: the anticipated duration

of any delay; an explanation and description of the reasons for any delay; Defendant's past and

planned actions to prevent or minimize any delay; a schedule for carrying out any current or

proposed actions to prevent or minimize the delay or the effect of the delay; Defendant's

rationale for attributing such delay to a force majeure event if it intends to assert such a claim;

and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to

an endangerment to public health, welfare or the environment. If Defendants makes a claim in

the written notice that the event is a force majeure event, Defendant shall include in the notice all

available documentation supporting the claim that the delay was attributable to a force majeure.

Failure to comply with the above requirements shall preclude Defendant from asserting any

claim of force majeure for that event for the period of time of such failure to comply, and for any

additional delay caused by such failure. Defendant shall be deemed to know of any circumstance

of which any entity controlled by Defendant or Defendant's contractors knew or, with the

exercise of due diligence, should have known.

     65.     If EPA, after inviting consultation from ADEQ and providing a reasonable

opportunity for ADEQ's review and comment, agrees that the delay or anticipated delay is

attributable to a force majeure event, the time for Defendant's performance of the obligations

under this Consent Decree that are affected by the force majeure event will be extended by EPA

for such time as EPA, in consultation with the State, deems is necessary for Defendant to complete those obligations. In the event that the positions of the United States and the State of Arkansas differ during this consultation, the position of the United States shall control. An extension of the time for performance of the obligations affected by the force majeure event shall not, in and of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

66.     If EPA, after inviting consultation from ADEQ and providing a reasonable opportunity for ADEQ's review and comment, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of EPA's decision. In the event that the positions of the United States and the State of Arkansas differ during this consultation, the position of the United States shall control.

67.     If Defendant elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay is a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that Defendant exercised best efforts to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 63 and 64, above. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation(s) of this Consent Decree that Defendant identified to EPA and the Court as being delayed by the force majeure event.

## IX.   **DISPUTE RESOLUTION**

68.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendant's failure to seek resolution of a dispute through the mechanisms of this Section shall preclude Defendant from raising any such issue in dispute as a defense to an action by the United States and/or the State of Arkansas to enforce any obligation of Defendant arising under this Consent Decree.

69.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States and the State of Arkansas a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations within the allotted period for informal negotiations, then the position advanced by the United States, in consultation with the State of Arkansas, shall be considered binding unless, within fifteen (15) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.  In the event that the positions of the United States and the State of Arkansas differ during the consultation required under this Paragraph, the position of the United States shall control.

70.     Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the State of Arkansas a written Statement of Position regarding the matter in dispute. Defendant's Statement of Position shall include, but need not be limited to, any factual data,

42

analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

71.     The United States shall serve Plaintiffs' Statement of Position upon Defendant within forty-five (45) Days of receipt of Defendant's Statement of Position.  Plaintiffs' Statement of Position shall be prepared by the United States in consultation with the State of Arkansas and shall include, but need not be limited to, any factual data, analysis, or opinion supporting the Plaintiffs' Statement of Position and any supporting documentation relied upon by the United States and/or the State of Arkansas.  In the event that the positions of the United States and the State of Arkansas differ during the consultation required under this Paragraph, the Statement of Position of the United States shall represent the final position of the Plaintiffs.  Plaintiffs' Statement of Position and shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

72.     Judicial Review. Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States and the State of Arkansas, in accordance with Section XIII of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within fifteen (15) Days of receipt of the Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

73.     The United States, in consultation with the State of Arkansas, shall respond to Defendant's motion under the preceding Paragraph within the time period allowed by the Local Rules of this Court.  In the event that the positions of the United States and the State of Arkansas

differ during this consultation, the position of the United States shall control. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

74.     Standard of Review

a.     Disputes Concerning Matters Accorded Record Review.  Except as otherwise provided in this Consent Decree, record review under applicable principles of administrative law shall apply in any dispute brought under Paragraph 70 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by the EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record.

b.     Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 70, Defendant shall have the burden of demonstrating that its position complies with this Consent Decree and the CWA.

75.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 59.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

44

## X.     INFORMATION COLLECTION AND RETENTION

76.     The United States, the State of Arkansas, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility covered by this Consent Decree, at all reasonable times, upon presentation of proper credentials, to:

   a.   monitor the progress of activities required under this Consent Decree;

   b.   verify any data or information submitted to the United States or the State of Arkansas in accordance with the terms of this Consent Decree;

   c.   obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants in connection with their performance under this Consent Decree;

   d.   obtain documentary evidence, including photographs and similar data, relevant to compliance with the terms of this Consent Decree; and

   e.   otherwise assess Defendant's compliance with this Consent Decree.

Inspections conducted by EPA, ADEQ or their representatives will be in conformance with the relevant provisions of EPA's *Routine Biosecurity Procedures for EPA Personnel Visiting Farms, Ranches, Slaughterhouses and other Facilities with Livestock and Poultry*, issued December 10, 2001, and any subsequent versions of that manual.

77.     Upon request, Defendant shall send or provide EPA and ADEQ, or their authorized representatives, splits of any samples taken by Defendant.  Upon request, EPA and ADEQ shall provide Defendant, or its authorized representatives, splits of any samples collected by the United State or ADEQ at Defendant's Facility, pursuant to Paragraph 76.c, including information documenting a chain of custody for such samples.

45

78.      Until at least five (5) years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into it or its contractors' or agents' possession or control, and that directly relate to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, the United States or the State of Arkansas may request copies of any documents, records, or other information required to be maintained under this Paragraph.

79.      At the conclusion of the information-retention period specified in the preceding Paragraph, Defendant shall notify the United States and the State of Arkansas at least ninety (90) Days prior to destroying any document(s), record(s), or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State of Arkansas, Defendant shall deliver any such document(s), record(s), or other information to EPA or ADEQ. Defendant may assert that certain documents, records, or other information otherwise subject to this Section X (Information Collection and Retention) are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant. However, no documents, records, data, or other information

46

that is created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

80.     Defendant may also assert that information required to be provided under this Section is protected as CBI under 40 C.F.R. Part 2, or as a Trade Secret under the Arkansas Trade Secrets Act, § 4-75-601 *et seq.* As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2 or any corollary state laws and regulations.

81.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State of Arkansas pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendnat to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

### XI.   EFFECT OF SETTLEMENT / RESERVATION OF RIGHTS

82.     Entry of this Consent Decree shall resolve all civil liability of Defendant to the United States and the State of Arkansas for the violations that the Plaintiffs alleged in the Complaint filed in this action, through the Date of Lodging of this Consent Decree, which include the Plaintiffs' civil claims under Sections 301, 309(b) and (d) of the CWA, 33 U.S.C. §§ 1311, 1319(b) and (d), and the Arkansas Water and Air Pollution Control Act, Ark. Code Ann. §§ 8-4-217(a)(1) and (a)(2), through the Date of Lodging, for the unauthorized discharge of pollutants at, or from, the Summers Facility in violation of the CWA and the State Act.

83.     Defendant's completion of all requirements identified in Section IV (Compliance Requirements) of this Consent Decree shall fully satisfy any outstanding response(s) that may have otherwise been due under the following EPA Administrative Orders and ADEQ Inspection

47

Report previously issued to Defendant: EPA Administrative Order No. CWA-06-2009-1758 (dated January 7, 2009); EPA Administrative Order No. CWA-06-2011-1911 (dated December 13, 2011); EPA Administrative Order No. CWA-06-2012-1817 (dated March 22, 2012); and ADEQ Inspection Report and Enforcement Notification (dated May 24, 2012, and as amended on June 6, 2012);

84.     The United States and State of Arkansas reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 82. This Consent Decree shall not be construed to limit the rights of the United States or the State of Arkansas to obtain penalties or injunctive relief under the CWA or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 82.

85.     In any subsequent administrative or judicial proceeding initiated by the United States or the State of Arkansas for injunctive relief, civil penalties, other appropriate relief relating to the Facility, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State of Arkansas in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 82 of this Section.

86.     Notwithstanding any other provisions of this Consent Decree, the Plaintiffs reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or a new action, if conditions at, or caused or contributed to by, the Summers Facility, previously unknown to the Plaintiffs, are discovered, and these previously unknown conditions,

48

together with any other relevant information, indicates that the provisions of this Consent Decree are not protective to human health or the environment. Previously unknown conditions shall not include any conditions that are described or referred to in information in the possession of the Plaintiffs on the Date of Lodging this Consent Decree.

87.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits, and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits. The United States and the State of Arkansas do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, or with any other provisions of federal, State, or local laws, regulations, or permits.

88.     This Consent does not limit or affect the rights of Defendant or the United States or the State of Arkansas against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

89.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not a party to this Consent Decree.

## XII.   COSTS

90.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State of Arkansas shall be entitled to collect the costs

(including attorneys' fees) incurred in any action necessary to collect any portion of the civil

penalty or any stipulated penalties due but not paid by Defendant.

## XIII.  **NOTICES**

91.    Unless otherwise specified herein, all notifications, submissions, or

communications required by this Consent Decree shall be made in writing to the designated

recipient for the entity receiving notice, and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, DC 20044-7611
Re: DOJ No. 90-5-1-1-09991

and


Regional Counsel
Office of Regional Counsel
United States Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

and

Director, Compliance Assurance an Enforcement Division
United States Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

To EPA:

Regional Counsel
Office of Regional Counsel
United States Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

50

and

Director, Compliance Assurance an Enforcement Division
United States Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

To the State of Arkansas:

Environmental Division
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201

To the Arkansas Department of Environmental Quality:

Chief, Water Division
5301 Northshore Drive
North Little Rock, Arkansas 72118-5317

Chief, Legal Division
5301 Northshore Drive
North Little Rock, Arkansas 72118-5317

To Defendant:

Arkansas Egg Company
Michael Cox, President
24185 Mill Rd.
Summers, AR 72769

92.    Any Party may, by written notice to the other Parties, change its designated notice

recipient(s) or notice address(es) provided above in Paragraph 91.

93.    Notices submitted pursuant to this Section shall be deemed submitted upon

mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties

in writing.

51

### XIV.  **EFFECTIVE DATE**

94.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

### XV.     **RETENTION OF JURISDICTION**

95.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections IX (Dispute Resolution) and XVI (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

### XVI.  **MODIFICATION**

96.     Except as provided in Paragraph 92, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court after filing the proposed modification with the Court.  Any extension of 180 days or less to the schedules under Section IV.A (Compliance Requirements – Well Installation and Groundwater Monitoring) or Section IV.B (Compliance Requirements – Lagoon Closure) of this Consent Decree may be approved by the subsequent written agreement of all Parties and shall not be considered a material change to a term of this Consent Decree for purposes of this Paragraph.

97.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section IX of this Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 74, the Party seeking the modification bears the

burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

### XVII. **TERMINATION**

98.     After Defendant has completed the requirements of Section IV of this Consent Decree (Compliance Requirements) and has thereafter maintained continuous satisfactory compliance with such completed requirements for a period of one year, and has obtained all permits required by Section IVIV.E of this Consent Decree (Compliance Requirements - Permits), has paid the civil penalties and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States and the State of Arkansas a Request for Termination of the Consent Decree, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

99.     Following receipt of Defendant's Request for Termination of the Consent Decree by the United States and the State of Arkansas, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.

100.     If the United States, after consultation with the State of Arkansas, agrees that the Consent Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

101.     If the United States, after consultation with the State of Arkansas, does not agree that the Consent Decree may be terminated, Defendant may invoke Dispute Resolution under Section IX of the Consent Decree. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 70 of Section IX, until sixty (60) Days after service of its Request for Termination.

### XVIII.  PUBLIC PARTICIPATION

102.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendant consent to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Consent Decree.

### XIX.   SIGNATORIES / SERVICE

103.    Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

104.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

105.    Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

### XX.    INTEGRATION

106.    This Consent Decree, including its Appendices and any Plaintiff-approved post-entry work plans or submittals required by this Decree, constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement

embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than Plaintiff-approved post-entry work plans or submittals made pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of the Consent Decree.

## XXI.   APPENDICES

107.   The following Appendices are attached to and incorporated as part of this Consent Decree:

    a.   "Appendix A" is the Comprehensive Nutrient Management and Closure Plan Revision 2 for Arkansas Egg Farm," dated April 25, 2013, and finalized June 10, 2013 (Closure Plan);

    b.   "Appendix B" is the Summary Table of Key Compliance Requirements

    c.   "Appendix C" is the Arkansas Egg Company, Inc. Financial Submissions

## XXII.   FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State of Arkansas, and Defendant.

The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated and entered this _____29th_____ day of _____October_____, 2013.

                                        _____
                                        UNITED STATES DISTRICT JUDGE
                                        Western District of Arkansas

56

WE HEREBY CONSENT to entry of the Consent Decree in <u>United States et. al v. Arkansas Egg Company, Inc.</u>

**FOR PLAINTIFF THE UNITED STATES OF AMERICA:**

Date: 6-27-13

NATHANIEL DOUGLAS
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

Date: 6-27-13

ROBYN E. HANSON
Trial Attorney
New York Bar No. 4462339
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-616-8907 (Phone)
Robyn.Hanson@usdoj.gov

CONNER ELDRIDGE
UNITED STATES ATTORNEY
Western District of Arkansas

Deborah Groom
Civil Chief /Assistant United States Attorney
Western District of Arkansas
414 Parker Avenue
Fort Smith, AR 72901
479-494-4074
Debbie.Groom@usdoj.gov

57

WE HEREBY CONSENT to entry of the Consent Decree in <u>United States et. al v. Arkansas Egg Company, Inc.</u>

**FOR PLAINTIFF THE UNITED STATES OF AMERICA (continued):**

Date: 6·24·13

JOHN BLEVINS
Director
Compliance Assurance and Enforcement Division
U.S. Environmental Protection Agency, Region 6
1445 Ross Ave.
Dallas, TX 75202-2733

Date: June 20, 2013

ELLEN CHANG-VAUGHAN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1445 Ross Ave.
Dallas, TX 75202-2733

58

WE HEREBY CONSENT to entry of the Consent Decree in United States et. al v. Arkansas Egg Company, Inc.

**FOR PLAINTIFF THE STATE OF ARKANSAS:**

Date: 6/28/13

Teresa Marks
Director
Arkansas Department of Environmental Quality
5301 Northshore Drive
North Little Rock, AR 72118
(501) 682-0959

Date: 6/28/13

Kendra Akiri Jones
Assistant Attorney General
Action on behalf of ADEQ
323 Center Street, Ste. 400
(501) 682-7383 (Direct Dial)
(501) 682-3895 (Fax)
Kendra.jones@arkansasag.gov

59

WE HEREBY CONSENT to entry of the Consent Decree in <u>United States et. al v. Arkansas Egg Company, Inc.</u>

**FOR DEFENDANT, ARKANSAS EGG COMPANY, INC.:**

Date: 6/20/13

Michael Cox
President
Arkansas Egg Company, Inc.

Date: 6.20.13

John R. Elrod
Attorney at Law
Connors & Winters, LLP
4375 N. Vantage Drive, Suite 405
Fayetteville, AR 72703